**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LORRAINE MASIE,**

    **Plaintiff,**

-vs-                 Case No. 6:04-cv-1067-Orl-KRS

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

_____

**ORDER**

    This matter came before the Court for consideration without oral argument on the complaint filed by Lorraine Masie seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 6. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05 for adjudication. Doc. No. 10, 12.

**I.  PROCEDURAL BACKGROUND.**

    On November 13, 2001, Masie applied for disability benefits under the Supplemental Security Income for Aged, Blind, and Disabled Program ("SSI"), 42 U.S.C. § 1381 *et seq.*, alleging a disability onset date of February 21, 2001. TR. 50-53. The SSA denied Masie's

application both initially and on reconsideration. TR. 31-37, 40-43, 46-47. Then, Masie made a timely request for a hearing. TR. 44.

An Administrative Law Judge ("ALJ") held a hearing on November 17, 2003. TR. 354. Masie, who was accompanied by her attorney and her mother, testified at the hearing. TR. 354-71.

The ALJ found that Masie had not engaged in substantial gainful activity since February 21, 2001, the alleged onset date of her disability. TR. 16. The ALJ concluded that Masie had systemic lupus erythematosus, fibromyalgia, and obesity, which were severe impairments under the SSA's regulations, but which did not meet or equal a listed impairment. TR. 16.

The ALJ found that Masie's allegations regarding her limitations were not totally credible. TR. 25. The ALJ wrote as follows:

> Considering the claimant's testimony versus the medical evidence of record, the undersigned finds that testimony somewhat exaggerated and disproportionate to the diagnostic and clinical findings. While the claimant alleged having severe joint pain and an inability to tolerate prolonged standing, walking, or sitting, the record shows that despite having SLE with secondary fibromyalgia and the effects of obesity, progress notes from Dr. Freeman and Summers have consistently shown that the claimant has had full range of motion of all joints and no active synovitis. The claimant also has alleged blurring vision, but an eye examination in August 2002 revealed 20/20 vision, and she was later prescribed glasses in February 2003 .
> . . . The claimant alleged having severe headaches, but Department of Health Records reflect that she was down to one headache per month on Tofranil. While the undersigned recognizes that the claimant is and has been having some pain and limitation of function because of her physical condition, the record has shown that her pain and other symptoms are at least partially controlled with medications and that she is indeed capable of work-related activities if so motivated.

TR. 14-15.

The ALJ found that Masie had the residual functional capacity ("RFC") to walk, stand, or sit for up to six hours in an eight-hour workday, frequently lift or carry up to ten pounds, and

occasionally lift or carry up to twenty pounds, which RFC is consistent with the ability to perform a full range of light work. TR. 17.

The ALJ found that Masie had no past relevant work. TR. 17. Using the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that there were jobs in the national economy that Masie could perform at the light work level and, therefore, that she was not disabled. TR. 17.

Masie requested review of the ALJ's decision. TR. 6-7. On June 18, 2004, the Appeals Council found no basis for changing the ALJ's decision. TR. 2-4. Masie timely sought review of this decision by the United States District Court. Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Masie's application for disability benefits under SSI. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

A.    *Masie's Testimony.*

Masie's was born on February 21, 1983. TR. 357. She graduated from high school. TR. 357. She was home schooled for her entire senior year of high school because a bout of pneumonia kept her from attending. TR. 369-70. She was five feet seven inches tall and weighed 325 pounds. TR. 361.

Masie complained that she had headaches four times a week along with pain in her shoulders, elbows, hands, knees, and back. TR. 357. After seven minutes of walking, her back

would start to hurt, and her feet, toes, and ankles would swell. TR. 357. Masie had been prescribed medication to treat her lupus, fibromyalgia, joint problems, and headaches, but the medication generally did not help alleviate her symptoms. TR. 358, 367.

Masie's doctors had told her that her back pain was caused by her weight problem. TR. 365. Her weight had increased as a result of medication she had taken, and she was slowly losing it. TR. 365-66. She testified that her weight gain was cause by Prednisone,[1] which she took for two and one half years to treat joint pain. TR. 367-68.

In terms of her physical abilities, Masie opined that she could lift a gallon of milk, stand for seven to ten minutes, and walk for fifteen to twenty minutes provided she had something on which to lean. TR. 366. She could sit in a straight-backed chair for approximately twenty minutes before she would have to move due to pain. TR. 366. Masie did not use any assistive devices as a matter of course, but did have a wheelchair in case she traveled somewhere "where it's going to be bad." TR. 358.

Masie occasionally experienced blurred vision. TR. 361. She also wore glasses for reading. TR. 361.

On a typical day, Masie would wake with a headache, which would last the whole day. TR. 359. Most days, Masie would lay in bed and watch television or do nothing. TR. 363. Her brother would help her get food. TR. 363. On a good day, she would get up, sit in the living room, watch television, and get the mail. TR. 363. On a "really good day," Masie would go to a

---

[1] Prednisone is a steroid that reduces swelling and enhances the body's ability to fight infections. Drugs.com *at* http://www.drugs.com/prednisone.html (last visited Sept. 29, 2005).

pet store with her cousin. TR. 363. Some days she would walk up and down the driveway with her puppy, but she could not do that for long because her back would start to hurt. TR. 364.

She occasionally washed the dishes. TR. 364. She went to the grocery store sometimes, but she could not shop with her friends because her back hurt too much. TR. 365. She neither drove, nor held a driver's license. TR. 363.

Masie testified that she could not remember anything. TR. 369. For example, she could remember a few things about the day before her hearing, but she could not remember most of the day. She said she could only read for approximately twenty minutes, because she would become dizzy and mix up the words. TR. 369. Masie had trouble sleeping, but with medicine she could usually get six hours of sleep each night. TR. 360-61.

    B.    *Medical Evidence.*

        1.    <u>Physical Condition</u>.

Kathleen Matthews, M.D., treated Masie since at least 1990. TR. 127-81. A chest x-ray in 1993 revealed that Masie had marked cardiomegaly. TR. 170. A number of medical records from the early 1990s chronicle a bout with pericarditis, which eventually resolved. TR. 105-10. A February 3, 2000, radiological examination of Masie's chest revealed no evidence of active disease, TR. 132, and an echocardiogram taken on the same date revealed normal results, TR. 115-16. On February 17, 2000, Dr. Matthews' notes reflect that Masie complained of joint pain that woke her from sleep, and intermittent swelling of her fingers. TR. 129.

Dr. Matthews referred Masie to Sara Johnson, M.D., a rheumatologist. Dr. Johnson examined Masie on April 3, 2000. Masie complained of "pleuritic chest pain, fever, malar flush

and polyarthritis involving the knees and hands, . . . Raynaud's phenomenon[2] and headache." TR. 121. Test results revealed a positive ANA, elevated sedimentation rate at 65, leukopenia and mild anemia.[3] TR. 121. She also observed a malar flush over Masie's face and a generalized erythematosus rash over her forearms and chest. Examination revealed that Masie had pain and limitations of motion in her shoulder joints, obvious swelling and pain on motion of her wrists and joints in her fingers, accumulation of fluid (effusion) and pain on motion in her knees and ankles. TR. 122. Dr. Johnson's diagnosis was systemic lupus erythematosus manifest by fever, pleuritis,[4] rash, and polyarthritis. TR. 122. Dr. Johnson prescribed Prednisone and gave Masie a Depo Medrol[5] injection. TR. 122. In a follow-up examination later in April, Masie had minimal joint complaints and some fatigue with a mild rash. However, her test results remained consistent with systemic lupus. TR. 119.

---

[2] Raynaud's phenomenon is a problem with blood circulation in the extremities that causes the skin to feel cold. *See* The Arthritis Society, *Raynaud's Phenomenon*, at http://www.arthritis.ca/types%20of%20arthritis/raynauds%20phenomenon/?mode=static (last visited Sept. 29, 2005).

[3] ANA, which stands for anti-nuclear anti-body, and sedimentation rate are tests used to diagnose lupus. Other typical symptoms or signs of lupus include leukopenia (low white blood cell count), hemolytic anemia, and a butterfly rash across the cheeks. Morris Reichlin, M.D., *Laboratory Tests Used in the Diagnosis of Lupus*, at http://206.161.82.9/education/brochures/labtests.html (last visited Sept. 29, 2005).

[4] Pleuritis is inflammation of the serous membrane surrounding the lungs. Stedman's at 1382-83.

[5] Depo Medrol is a cortisone-like medication used to treat inflamed areas of the body. Drugs.com *at* http://www.drugs.com/cons/Depo_Medrol.html (last visited Sept. 29, 2005).

Based on an eye examination in February 28, 2001, Masie's vision was between 20/20 and 20/25. TR. 118; *see also* TR. 299-300. A follow-up examination in August 2002 showed that her vision was 20/20 in each eye, uncorrected. TR. 305.

A June 1, 2000, radiographic examination of Masie's ankle revealed soft tissue swelling, but no evidence of fracture or dislocation. TR. 131. A June 19, 2000, MRI of Masie's spine revealed no abnormalities. TR. 130. A June 14, 2001, CT scan of Masie's chest revealed areas of linear and somewhat patchy infiltrate in the right upper lobe possibly representing residual from pneumonia. TR. 127.

On October 18, 2001, Augustine Ramos, M.D., interpreted the results of an echocardiogram of Masie. TR. 183. Dr. Ramos' impressions were systemic lupus, a recent history of pericardial effusion, which had resolved, extreme obesity, hypertension, and a sudden malar rash. TR. 183, 310. Dr. Ramos recommended continuing her medications and wrote, "[h]opefully, she will lose some weight and her blood pressure will decrease as her steroids are tapered." TR. 183. He noted that while Masie's symptoms had improved with medication, she had still had some chest pain as late as two days earlier. TR. 310.

Mary E. Stockett, M.D., treated Masie beginning at least by August 2001. TR. 247. Masie complained of joint pain, fatigue and hair loss. Dr. Stockett referred her to Rheumatology Associates. TR. 246-47. In September 2001 and February 2002, Masie complained of chest pain. TR. 244. An echocardiogram showed mild pericardial effusion. TR. 245. In March and April 2002, she complained of having headaches three times a week, sometimes with sensitivity to light

and sound (photo and phonophobia). TR. 242, 316. In August 2002, Masie complained of chest, ankle and knee pain. TR. 314.

From September 2001 to April 2003, Masie received treatment from Pamela G. Freeman, M.D., and Laura B. Summers, M.D., of Rheumatology Associates. TR. 218-32; 318-36. On September 20, 2001, at Masie's initial office visit, Dr. Freeman noted that Masie had had a recent flare up of pain, and that she was taking CellCept,[6] Prednisone, Plaquenil,[7] Prevacid,[8] Ambien,[9] and Vicodin.[10] TR. 233. Dr. Freeman's assessments were SLE (lupus), Iatrogenic Cushing's Syndrome,[11] and chest pain consistent with pericarditis. TR. 232. Drs. Freeman and Summers made similar assessments regarding Masie at follow-up appointments, and made several adjustments to her medication in attempts to reduce the amount of Prednisone Masie was taking. TR. 226-30.

---

[6] CellCept is an immunosuppressant, which is a drug that retards the body's immune system so that it will not, for example, reject a transplanted organ. Drugs.com *at* http://www.drugs.com/mtm/c/cellcept.html (last visited Sept. 29, 2005).

[7] Plaquenil is a drug that kills protozoa, and is often used to treat lupus. Drugs.com *at* http://www.drugs.com/mtm/p/plaquenil_sulfate.html (last visited Sept. 29, 2005).

[8] Prevacid is a medication that neutralizes digestive acid. Drugs.com *at* http://www.drugs.com/mtm/p/prevacid.html (last visited Sept. 29, 2005).

[9] Ambien is a drug that induces sleep. Drugs.com *at* http://www.drugs.com/mtm/a/ambien.html (last visited Sept. 29, 2005).

[10] Vicodin is a narcotic painkilling drug. Drugs.com *at* http://www.drugs.com/mtm/v/vicodin.html (last visited Sept. 29, 2005).

[11] Iatrogenic Cushing's Syndrome is a form of Cushing's syndrome caused by administration of glucocorticoid hormones, such as prednisone. AMERICAN MEDICAL NETWORK, IATROGENIC CUSHING'S SYNDROME, *available at* http://www.dental.am/more/8301_0_14_0_C239 (last visited Sept. 29, 2005).

In January 2002, Masie complained of diffuse pain all over. Upon examination, Dr. Summers identified 18 trigger points, resulting in a diagnosis of fibromyalgia. TR. 223. Fibromyalgia continued to interfere with Masie's sleep. TR. 218-19. In September 2002, Masie's complaints included shortness of breath and swelling in her hands and feet. TR. 324. In October 2002, she complained of diffuse joint pain and morning stiffness. She had mild symptoms of Raynaud's phenomenon. TR. 322.

In January 2003, Masie continued to complain of diffuse arthralgias, occasional swelling in her hands, and morning stiffness, as well as continuing problems with insomnia. TR. 320-21. In April 2003, Masie complained that her whole body was aching and she had some depressive symptoms. Dr. Summers opined that the increased pain and depression were due to fibromyalgia. TR. 318. Both physicians repeatedly noted that Masie exhibited no synovitis[12] and that she had a full range of motion in her joints. They also prescribed Doxepin,[13] Vioxx,[14] Lexapro,[15] and Celebrex[16] for Masie on different occasions. TR. 318, 321, 323, 331.

---

[12] Synovitis is the inflammation of a synovial membrane, especially that of a joint. Stedman's at 1746.

[13] Doxepin is a tricyclic antidepressant medication. Drugs.com *at* http://www.drugs.com/mtm/doxepin.html (last visited Sept. 29, 2005).

[14] Vioxx is a non-steroidal anti-inflammatory medication. Drugs.com *at* http://www.drugs.com/mtm/v/vioxx.html (last visited Sept. 29, 2005).

[15] Lexapro is a serotonin reuptake inhibitor, which is used to treat depression by increasing amounts of a pleasure-inducing chemical in the brain. Drugs.com *at* http://www.drugs.com/mtm/l/lexapro.html (last visited Sept. 29, 2005).

[16] Celebrex is a non-steroidal anti-inflammatory medication. Drugs.com *at* http://www.drugs.com/mtm/c/celebrex.html (last visited Sept. 29, 2005).

On July 9, 2002, Dr. Ramos examined Masie and noted that she was experiencing a new onset of headaches. These headaches, which occurred on a daily basis, were accompanied by sensitivity to light (photophobia), sound (phonophobia), occasional nausea, vomiting and blurred vision. She was also confused and forgetful. TR. 307. Dr. Ramos also observed that Masie had hypertension and extreme obesity. TR. 309.

On September 3, 2002, Joseph A. Cimino, M.D., examined Masie. His impression was chronic headaches, for which he increased Masie's Tofranil prescription.[17] TR. 304. On January 21, 2003, Masie underwent an examination at a neurology clinic based on complaints of chronic headaches. TR. 301. Dr. Cimino, who completed a report of this examination, noted that use of the medication Tofranil had reduced the frequency of Masie's headaches from daily to once per month. TR. 301. In August 2003, Masie told Dr. Cimino that she was again experiencing daily headaches, which Dr. Cimino believed were secondary to depression and chronic illness. Dr. Cimino opined that Masie was "in need of chronic medical treatment" and that it was a "travesty" that she had been denied coverage under Medicaid. TR. 337.

Dr. Cimino also treated Masie for chest pain, which he attributed to her obesity. TR. 303. His records also indicate that Masie had hypertension. TR. 304.

In January 2003, Masie sought emergency room treatment for head and abdomen pain. TR. 288. The diagnosis was acute sinusitis with headache. TR. 277.

---

[17] Tofranil is a tricyclic anti-depressant drug. Drugs.com, *at* http://www.drugs.com/mtm/t/tofranil.html (last visited Sept. 29, 2005).

On December 4, 2003, a physician's assistant working with Dr. Summers completed a fibromyalgia RFC questionnaire and a lupus RFC questionnaire regarding Masie. TR. 339-47.[18] The fibromyalgia questionnaire indicates that Masie had the following symptoms: multiple tender point; nonrestorative sleep; chronic fatigue; morning stiffness; muscle weakness; subjective welling; frequent, severe headaches; numbness and tingling; sicca (dryness) symptoms; Raynaud's phenomenon; dysmenorrhea; breathlessness; anxiety; panic attacks; depression; and chronic fatigue syndrome. TR. 339. The lupus questionnaire reflects that Masie had swelling in her elbows, hands, knees, and feet, redness in her hands and ankles, and significant loss of motion and tenderness in all joints. TR. 343. She had cardiopulmonary involvement as shown by pericarditis, renal involvement, hemolytic anemia, "[p]ositive LB cell preparation *or* anti-DNA *or* anti-Sm anti-body," a positive test for ANA, and gastrointestinal complaints. TR. 343-44. She also experienced the following symptoms of lupus: severe fatigue; severe fever; severe malaise; muscle weakness; poor sleep; migraine headaches; impaired vision; peripheral neuropathy; hair loss; impaired muscle coordination; and Raynaud's phenomenon. TR. 344. There is a note on the fibromyalgia questionnaire stating that the functional capacity questions "would be better evaluated by a physical therapist." TR. 341. However, another note on the lupus questionnaire reflects that "Lorraine is unable to bend, stoop, do fine manipulation, walk or stand for any length of time. She cannot work any type of job at this time. She has constant severe joint and muscle pain, swelling, stiffness, migraines, depression, etc." TR. 347. A handwritten note reflects that Masie had a wheelchair to use for traveling long distances. TR. 341.

---

[18] It appears that Dr. Summers approved both of these forms based on her stamped signature at the end of each questionnaire.

In response to the specific functional capacity categories, the forms reflect that Masie could walk one block before needing to rest, sit for twenty minutes before needing to get up and move, and stand for five minutes before needing to sit. TR. 341. She could only stand, walk, or sit for less than two hours in an eight-hour workday. TR. 341. Masie would need a job that permitted shifting positions at will and taking unscheduled five-minute breaks every ten minutes. TR. 341. In addition, Masie would need to have her legs elevated sixty degrees for at least seventy percent of each eight-hour workday. TR. 341. Masie could frequently lift and carry less than ten pounds, rarely carry ten pounds, and never lift and carry twenty pounds or more. TR. 342. In addition, Masie could rarely twist, and could never stoop, crouch, or climb stairs or ladders. TR. 342. Masie could never look up and rarely hold her head in one position. TR. 342. She would have to avoid all exposure to extreme cold, extreme heat, soldering fluxes, solvents, fumes, odors, or gases, dust, and chemicals. TR. 346. She would also have to avoid even moderate or concentrated exposure to high humidity, wetness, and perfumes. TR. 346.

  2. <u>Mental Condition</u>.

On January 28, 2002, Scott M. Kaplan, Psy. D., performed a clinical interview and a mental status evaluation of Masie at the request of the Florida Office of Disability Determinations. TR. 202-04. Masie complained of depression, constant and chronic back, joint, and stomach pain and chronic headache pain. She had trouble falling asleep and staying asleep, was irritable, fatigued and had crying spells. TR. 202. Dr. Kaplan observed and Masie's mood and affect were depressed, and that her concentration and memory functioning were variable due to pain. TR. 203. Dr. Kaplan stated, "[f]rom a psychological and emotional standpoint, Lorraine is capable of

gainful activity and should not experience significant decompensation." TR. 203. Dr. Kaplan noted that Masie's symptoms were consistent with a major depressive episode and chronic pain syndrome. TR. 203. Dr. Kaplan opined that "[i]f placed in a relatively low stress and low demand work environment Lorraine will be able to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, and remember as well as understand job instructions." TR. 203.

  C. *Reviewing Physicians' Opinions*.

Each of the following assessments was made after a review of Masie's records.

  1. <u>Physical Condition</u>.

On January 4, 2002, Gloria G. Hankins, M.D., completed a physical RFC assessment of Masie. TR. 194-201. Dr. Hankins opined that Masie would be subject to the following exertional limitations: (1) occasionally lift or carry no more than twenty pounds; (2) frequently lift or carry no more than ten pounds; (3) stand or walk no more than six hours in an eight-hour workday; (4) sit for no more than six hours in an eight-hour workday; and (5) unlimited pushing or pulling. TR. 195. In addition, Dr. Hankins noted that Masie would have to avoid even moderate exposure to extreme heat due to lupus. TR. 198.

On May 17, 2002, Violet A. Stone, M.D., completed a physical RFC assessment of Masie. TR. 264-71. Dr. Stone's opinion regarding Masie's impairments was the same as that of Dr. Hankins, with the exceptions that Dr. Stone opined that Masie could only stand or walk for two hours in an eight-hour workday and that she would have no environmental limitations. TR. 265, 268.

    2.  Mental Condition.

On February 7, 2002, Karen Johnson, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") regarding Masie. TR. 205-17. Dr. Johnson opined that Masie had a depressive syndrome characterized by appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating, and thoughts of suicide. TR. 208. She further opined that Masie would have mild restrictions in the activities of daily living, and mild difficulties in maintaining concentration, persistence, or pace. TR. 215.

On May 10, 2002, David R. Cox, Ph.D., completed a PRTF and a mental RFC assessment regarding Masie. TR. 248-64. Dr. Cox also acknowledged major depressive syndrome. TR. 251. He opined that Masie's mental condition would cause mild restriction of the activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. TR. 258. In his RFC assessment, Dr. Cox opined that Masie would be moderately limited in the following: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. TR. 261-62.

**IV. STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less

than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the

proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.     ANALYSIS.**

Masie raises a number of interrelated issues that arise from the ALJ's failure properly to assess her pain and other subjective symptoms, and the functional impairments arising therefrom. These include that the ALJ erred by failing to give controlling weight to the opinion of Dr. Summers, a treating physician, and, as a result, arrived at an RFC assessment that is not supported by substantial evidence. She also contends that the ALJ erred in finding that her mental impairments were not severe. Finally, she asserts that it was inappropriate to rely exclusively on the grids at step five of the sequential evaluation process. All of these issues are meritorious.

It is undisputed that Masie suffers from fibromyalgia, which is a "'syndrome [that] is a common form of generalized muscular pain and fatigue.'" *Stewart v. Apfel*, No. 99-6132, 2000 U.S. App. LEXIS 33214, at *7 (11th Cir. Dec. 20, 2000) (alteration original) (quoting Arthritis Foundation & Am. College of Rheumatology, *Arthritis Information: Fibromyalgia* (1992)). "The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . multiple tender spots . . . ." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Masie consistently complained of all of these symptoms, which complaints were credited by her doctors. The American College of Rheumatology has stated that because fibromyalgia lacks physical and laboratory findings, a physician must depend mostly on a person's reports of symptoms. *Stewart,* 2000 U.S. App. LEXIS 33214, at *7-8. "Thus, a treating physician's determination that a patient is disabled due to

fibromyalgia is even more valuable because there are no objective signs of severity and the physician must interpret the data for the reader." *Id.* at *9.

Rather than relying upon Masie's treating physicians to interpret the medical data, the ALJ stated that he gave limited weight to the opinions of Dr. Summers and Dr. Freeman concerning the functional limitations arising from fibromyalgia. He also gave limited weight to Masie's testimony about her impairments. The ALJ stated that RFC assessments prepared by a physician's assistant for Dr. Summers was not persuasive because Masie "has consistently had full range of motion in all of her joints with no active synovitis." TR. 15. The ALJ gave little weight to the functional capacity assessment because it was "based on subjective complaints from the claimant and [are] inconsistent with the records of Dr. Freeman and Dr. Summers." *Id.* These statements show that the ALJ had a fundamental misunderstanding of the nature of fibromyalgia, the severity of which, as discussed above, cannot be supported by objective signs.

Furthermore, even if the record established "good cause" for the ALJ's rejection of Dr. Summers' opinion, it was still error for the ALJ to rely on the RFC assessments of non-treating non-examining physicians to make a RFC finding, rather than further developing the record to determine whether Masie was disabled. *Johnson v. Barnhart*, No. 04-14581, 2005 WL 1523499, at *4 (11th Cir. June 29, 2005) (noting that after rejecting opinion of treating physician, ALJ could not give greater weight to opinion of non-examining physician); *see also Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("The opinions of nonexamining, reviewing physicians . . . when contrary to those of examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence.").

Masie urges the Court to reverse the decision of the Commissioner and to award benefits to her. The court may "remand the case for an entry of an order awarding disability benefits where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Because the ALJ has not requested the assistance of a vocational expert to assess whether there is work that Masie could perform in light of her exertional and nonexertional impairments, I cannot determine at this juncture that the evidence establishes disability without any doubt. Accordingly, remand is required to permit the SSA to reassess Masie's functional limitations, giving due regard to the opinions of her treating and examining physicians.

### VI.  CONCLUSION.

For the reasons stated above, it is **ORDERED** that the decision of the SSA is **REVERSED** and the case is **REMANDED** for further proceedings. It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, close the file. Finally, the Clerk of Court is directed to mail a copy of this order to the claimant at the address listed below.

**DONE** and **ORDERED** in Orlando, Florida on September 29, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record

Lorraine Masie
2128 Little John Rd.
Melbourne, Florida 32935